**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JASON TOWNS, GARLAND ELEBY, LETITIA JACKSON, KAREN LANFORD, TAMIA NUNN, REGINALD SCOGGINS, CHRISTOPHER TRASS, DARRYL WOODS, ERICKA GARMON, SHAWNDA SIMMONS, and LATICIA DANIEL, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | Jury Trial Demanded |
| v. | |
| PEOPLES GAS LIGHT & COKE CO. and WEC ENERGY GROUP, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Jason Towns, Garland Eleby, Letitia Jackson, Karen Lanford, Tamia Nunn, Reginald Scoggins, Christopher Trass, Darryl Woods, Ericka Garmon, Shawnda Simmons, and Laticia Daniel, on behalf of themselves and all others similarly situated, by and through their attorneys, Stowell & Friedman Ltd., file this Complaint against Defendants Peoples Gas Light & Coke Company and WEC Energy Group (collectively, "Peoples Gas" or "Defendants").

1.      Peoples Gas is a public utility tasked with the highly lucrative job of providing natural gas service to over 800,000 customers throughout the Chicagoland area. Peoples Gas has made six straight years of record profits while Chicagoans struggle to pay their bills, and it was just granted a record-setting rate hike of $300 million. Less well known yet equally pernicious, Peoples Gas rampantly discriminates against its African American employees and customers despite its responsibilities to the public.

2.      Peoples Gas subjects its African American employees to a relentlessly hostile work environment, where they are targeted with racial harassment and slurs, including being called the n-word, forced to follow different rules than non-Black employees, and their safety and lives are not valued. Being a Black Peoples Gas employee can be a life-or-death job: most Plaintiffs have been physically assaulted and robbed on the job, including at gunpoint. The hostile work environment at Peoples Gas includes an open disdain and differential treatment of African American customers, as non-Black employees trash their property and express shock when African American customers have two-parent families or nice homes.

3.      Peoples Gas's racially biased culture and discriminatory policies and practices harm African American employees and customers and put their lives at risk. Peoples Gas's brazen disrespect of and disregard for Black lives ranges from steering its African American employees to dangerous working conditions without adequate security, to forcing its African American customers to dig up their own gas service lines for reconnection, a dangerous and demeaning endeavor.

4.      Consistent with its racially biased corporate culture, Peoples Gas maintains discriminatory employment practices that result in, among other things, Black employees being paid less, disciplined more, and denied advancement because of their race. Perhaps worse, Peoples Gas segregates and assigns Black employees to more dangerous locations and jobs, and denies them potentially life-saving security, pursuant to company practices and deeply racist views about African Americans.

5.      Peoples Gas has long been aware of its racist policies and practices and the harm they cause, yet its deeply rooted, systemic discrimination persists. Peoples Gas fosters and reinforces its racial discrimination by protecting harassers and failing to effectively monitor the

treatment of African American employees or to adequately investigate or resolve complaints of racial discrimination, or take meaningful action against discriminators. To the contrary, Peoples Gas targets and retaliates against those courageous enough to report and speak out about discrimination.

6. Plaintiffs, and the class they seek to represent in this lawsuit, seek to eradicate Peoples Gas's profoundly discriminatory culture and reform its companywide policies and practices that currently result in danger, lower pay for, and worse treatment of African Americans.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

8. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because Defendant Peoples Gas resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

9. Defendant Peoples Gas is a natural gas and public utility company operating in Illinois, providing natural gas to approximately 880,000 customers in Chicago. In 2022, Peoples Gas generated a record-setting $209 million in net income. Peoples Gas has three primary locations in Chicago, its South Shop, Central Shop, and North Shop.

10. Peoples Gas is owned by Defendant WEC Energy Group Inc. ("WEC"), an S&P 500 electric and natural gas delivery company with more than 4.6 million customers in Wisconsin, Illinois, Michigan, and Minnesota and a record-setting 2022 net income of $1.4

billion. WEC oversees and supports Peoples Gas, including in Human Resources, and formulates corporate policies governing Peoples Gas employees.

11.     Plaintiff Jason Towns ("Towns") is African American and has worked for Peoples Gas for over 17 years until his unlawful termination in 2022 when he held the position of Crew Leader. He returned to Peoples Gas as a Gas Mechanic 10 in 2023.

12.     Plaintiff Garland Eleby ("Eleby") is African American and has worked for Peoples Gas for approximately five years and is currently a Utility Worker in Peoples Gas's South Shop.

13.     Plaintiff Letitia Jackson ("Jackson") is an African American woman and worked for Peoples Gas from 2019 until her constructive discharge in 2022, when she was a Utility Worker in Peoples Gas's South Shop.

14.     Plaintiff Karen Lanford ("Lanford") is an African American woman and has worked for Peoples Gas for approximately 16 years and is currently an Operations Apprentice in Peoples Gas's South Shop.

15.     Plaintiff Tamia Nunn ("Nunn") is an African American woman and worked at Peoples Gas from 2018 until her unlawful termination in 2022, when she was a Utility Worker in Peoples Gas's South Shop.

16.     Plaintiff Reginald Scoggins ("Scoggins") is African American and has worked at Peoples Gas for over 14 years and is currently a Journeyman in Peoples Gas's South Shop.

17.     Plaintiff Christopher Trass ("Trass") is African American and has worked for Peoples Gas for approximately 16 years and is currently a Crew Leader in Peoples Gas's South Shop.

18.     Plaintiff Darryl Woods ("Woods") is African American and has worked for Peoples Gas for approximately 18 years and is currently a Utility Worker in Peoples Gas's South Shop.

19.     Plaintiff Ericka Garmon ("Garmon") is African American and has worked for Peoples Gas for approximately 24 years and is currently an Operations Specialist II in Peoples Gas's South Shop.

20.     Plaintiff Shawnda Simmons ("Simmons") is African American and has worked for Peoples Gas for approximately 16 years and is currently an Operations Specialist II in Peoples Gas's South Shop.

21.     Plaintiff Laticia Daniel ("Daniel") is African American and worked at Peoples Gas from 2006 until her constructive discharge in 2023, when she was an Operations Specialist II in Peoples Gas's South Shop.

<u>**FACTUAL ALLEGATIONS**</u>

**I. Defendants Are Engaged in Systemic Race Discrimination Against African American Employees and Customers**

22.     Peoples Gas is engaged in a pattern and practice of systemic race discrimination and intentionally employs policies and practices that have a disparate impact on Black workers. Peoples Gas fosters an unflinchingly hostile work environment, including through racist acts against employees and customers, and maintains practices that expose its African American employees to assault, often at gunpoint, through racial steering and lack of security; result in discriminatory promotions, assignments, and overtime; and result in unequal discipline, up to and including termination.

Hostile Work Environment and Racist Treatment of Customers

23.    Peoples Gas has long condoned and actively cultivated a racially hostile work environment. *See e.g.*, *White v. The Peoples Gas Light & Coke Co.*, No. 16-cv-7809 (N.D. Ill. Aug. 2. 2016), Dkt. 1 (alleging that Peoples Gas "Defendants have and are engaged in a pattern or practice of racial discrimination, harassment, and retaliation against African Americans and others who challenge the discriminatory treatment of African Americans").

24.    African Americans at Peoples Gas have been subjected to racist name calling and slurs by coworkers and supervisors, including "blackie," "lips," "boy," and the n-word. Leaders state that they need to "crack the slave whip," or words to that effect.

25.    During Barack Obama's presidency, a white employee showed African American employees a bullet while on Peoples Gas property, telling the African American employees that the bullet was for their President, or words to that effect. Despite knowing of this employee's conduct, Peoples Gas did not terminate this employee.

26.    As another example, a white crew leader distributed links to racist Instagram videos. For example, one link is to a video of a man wearing a t-shirt stating "N***** 4 TRUMP," and several of these videos maintain that Michelle Obama is a man, as depicted below.





27.     Non-Black employees openly disparage African American employees and customers at work, further fostering a hostile environment. Among other examples, non-Black employees and managers:

        a.    openly refer to African American customers as the n-word;

     b.  express shock when African American customers have two-parent families or nice homes; and

     c.  target Black women with racial attacks and slurs, including questioning whether they have "real" hair, calling them racial slurs (e.g. "nasty bitches"), and insinuating that they exchange sex for continued gas service.

28.    This blatant racism toward African American customers manifests in worse treatment. Peoples Gas's non-Black employees often treat African American customers rudely, disdainfully, and worse because of their race, including in ways that are dangerous to their health, safety, and property. Peoples Gas's racist treatment of African American customers includes, by way of example:

     a.  requiring African American customers to dig up their own services lines for reconnection—a dangerous and demeaning demand that Peoples Gas does not make of its non-Black customers;

     b.  tracking dirt inside African Americans' homes by refusing to wear readily available booties;

     c.  denying maintenance routinely offered to non-Black customers;

     d.  searching for reasons to turn off African American customers' gas; and

     e.  leaving worksites in African American communities strewn with debris.

"Looks good from my home," exclaimed one non-Black Peoples Gas employee while looking out over a worksite in a Black community left in disarray, encapsulating Peoples Gas's arrogant and racist attitude toward and discriminatory treatment of its African American customers.

Racial Steering and Assignment of Inadequate Security for African American Employees

29.    Peoples Gas steers African Americans to more dangerous locations and assignments but denies them adequate security to keep them safe on the job, resulting in assault and robbery of African American employees, often at gunpoint.

30.    Peoples Gas Utility Workers primarily work from one of three shops—the North Shop, the Central Shop, or the South Shop. Utility Workers assigned to these shops mostly provide service to Chicago's North Side, West Side, and South Side, respectively. However,

Peoples Gas segregates its workforce by race by disproportionately assigning African Americans to work at the South Shop, which services more African American communities.

31.     Within each shop, Peoples Gas assigns its African American Utility Workers, because of their race, to work in more dangerous neighborhoods more frequently than it does non-Black employees. Further, during Plaintiffs' employment, Peoples Gas frequently assigned African American Utility Workers on the night shift to complete non-emergency work, needlessly putting them at risk. In the last several years, at least twenty-two Peoples Gas employees assigned to the South Shop have been assaulted at gunpoint or similarly attacked while on the job. Twenty-one of these employees were Black.

32.     Peoples Gas's inadequate and discriminatory allocation of security practices exacerbate the risk to these workers. Peoples Gas fails to provide Black Utility Workers with security as a matter of course, even when the company dispatches them to high-crime areas. Peoples Gas has only a handful of security workers for the entire city, often fewer at night, and sometimes it can take over an hour for security to arrive. Peoples Gas has chastised employees who wait for security for not completing more jobs in a given day.

33.     As Peoples Gas disproportionately assigns African American employees to work in more dangerous neighborhoods, these employees bear the brunt of Peoples Gas's inadequate security.

34.     As voiced by management, Peoples Gas holds racially biased views where African Americans belong to a more dangerous sector of society, and as such, their violent assaults should be expected and accepted, not prevented.

35.     Indeed, after five Black employees—Plaintiffs Eleby, Lanford, Nunn, Scoggins, and Trass—were robbed at gunpoint on the job in quick succession, Peoples Gas responded with

safety "training" reflecting its discriminatory culture, warning its employees to not be a target and discouraging them from wearing expensive or flashy jewelry.

Discriminatory Practices Governing Promotions, Overtime, and Job Assignments

36.     Peoples Gas employs uniform practices that discriminatorily deny African Americans advancement opportunities, resulting in a racially lopsided organization, with fewer African Americans in management and higher paying positions. The promotion process is riddled with discrimination. Certain promotions are based on exams, and if an employee does not pass an exam, they can have their pay or seniority decreased. Given the importance of these exams, Peoples Gas disproportionately gives non-Black employees study materials far in advance. In contrast, Peoples Gas routinely springs these exams on African American employees, forcing them to take the exams with little or no preparation. Moreover, if a non-Black employee does not pass an exam on the first try, they are often given the opportunity to retake it without consequences. When African American employees fail, they are docked pay or demoted.

37.     Other promotions occur after an interview process instead of an exam. As a result of discriminatory grooming and interview practices, these positions are disproportionately filled by non-Black employees. For example, in 2022 the South Shop had seven new supervisors begin, none of whom are African American. This occupational segregation concentrates power in the hands of disproportionately non-Black supervisors, which they exercise against Black workers.

38.     Peoples Gas also employs discriminatory practices regarding the assignment of overtime, which result in overtime being assigned disproportionately by race. Pursuant to these practices, Black workers are denied substantial and valuable overtime work, resulting in a

substantial wage gap by race. Peoples Gas openly acknowledges the role of race in assigning overtime. For example, regarding overtime, non-Black employees often remark that "Black people don't want to work" or "you brothers just don't want to work," or words to that effect. These remarks are made in the presence of supervisors, who laugh along and agree, making statements such as "you're not wrong!"

39. Further, when Black employees are permitted overtime, it is often for less work and backbreaking work, while the easier, less physical labor is reserved for non-Black workers. Similarly, supervisors have a practice of allowing non-Black employees the first pick of job assignments, leaving the less desirable jobs for its African American employees.

Discriminatory Discipline and Termination Practices

40. Peoples Gas employs discriminatory discipline practices. Pursuant to these practices, Peoples Gas targets its Black employees for heightened scrutiny and unwarranted and differential discipline, including termination. This unfair and unwarranted discipline results in lower pay and denies Black employees advancement opportunities and promotion.

41. For example, African American employees in the South and Central Shops are minutely scrutinized for the time they clock out at the end of a shift and are routinely disciplined for clocking out early. Non-Black employees, however, have free reign to clock out early without fear of discipline.

42. In other instances, Peoples Gas has punished African American employees more harshly for the same conduct than it did non-African American employees. Peoples Gas accommodates non-Black employees, but punishes Black employees for the same infractions. Peoples Gas has even terminated Black employees for conduct that is left completely unpunished for non-Black employees.

* * *

43. In sum, Peoples Gas has and is engaged in a pattern and practice of race discrimination against African American employees, including, but not limited to the following employment practices:

    a. maintaining a racially hostile work environment created through the harassment, bullying, and micromanagement of its African American employees and open ridicule and mistreatment of its African American customers, among other things;

    b. discriminatory racial steering and job and territory assignment practices, which result in assigning African Americans to more dangerous locations and assignments and providing them with inadequate security, causing their assault and attempted robbery, often at gunpoint;

    c. discriminatory overtime and pay practices, including assigning lucrative overtime and favorable work assignments based on race;

    d. discriminatory performance and discipline practices, including the practice of subjecting African Americans to a higher level of scrutiny than non-African Americans, resulting in disproportionate discipline, up to and including termination;

    e. discriminatory training, job assignment, and promotion practices, which deny advancement and pay to African Americans; and

    f. engaging in a practice of retaliation and further discriminating against African Americans who oppose unlawful discrimination.

44. As a result of this pattern and practice of discrimination, Peoples Gas pays its Black employees less that its non–Black employees, forces its Black employees to work in materially more dangerous conditions than its non-Black employees, and subjects them to a racially hostile work environment.

## II. Plaintiffs Were Subjected to and Injured by Peoples Gas's Unlawful Conduct

Plaintiff Jason Towns

45. Plaintiff Jason Towns worked for Peoples Gas in the Central Shop for approximately 17 years until his unlawful termination in 2022. Towns was subjected to and

12

harmed by Peoples Gas's discriminatory policies and practices described above, among other unlawful conduct.

46.     Throughout his employment, Towns was subjected to a racially hostile work environment, including racial slurs by coworkers and supervisors, such as the n-word. Supervisors would also state that they had to "crack the slave whip," or words to that effect, and tell Towns "let me see your big penis," or words to that effect, engaging in the hyper-sexualization of Black men.

47.     Nevertheless, Towns always worked hard and performed at a high level, and in or around 2019, Towns was promoted to the position of Crew Leader. This same year, Towns was held up at gunpoint while on a job. Consistent with Peoples Gas's racial steering and race matching, it assigned Towns a job in a high-crime and predominately African American neighborhood because of his race. And consistent with Peoples Gas's disregard for the safety of its African American employees, it required Towns to work this non-emergency assignment after dark and denied him security. Even after Towns was held up at gunpoint, Peoples Gas expressed no concern for his wellbeing. To the contrary, it instead sent Towns out the very next night again into a dangerous neighborhood to do non-emergency work.

48.     Consistent with its discriminatory policies and practices, Peoples Gas denied Towns and other African American Crew Leaders overtime at the same level it assigned to non-Black Crew Leaders. Further, Peoples Gas gave non-Black Crew Leaders the first pick of assignments, leaving the African American Crew Leaders with the leftovers. Illustrative of its racially biased corporate culture, Peoples Gas assigned African American Crew Leaders the most demeaning and least desirable jobs. For example, a crew led by a white Crew Leader damaged a sewer line, causing the worksite to fill with feces. Peoples Gas required Towns and his crew to

clean up the human waste rather than the team led by the white Crew Leader, even though Towns' team in no way caused the damage.

49.     Consistent with its racially biased views and practices, Peoples Gas treated its African American customers poorly. Shockingly, Peoples Gas even required African American customers to dig up their own service lines to be reconnected. Not only is this incredibly dangerous for the customer and the community, it also put Towns' job at risk. As Towns was the last individual documented as having worked on these sites, Peoples Gas would have blamed Towns for any damage that resulted.

50.     Peoples Gas is aware of its racially hostile work environment and systemic race discrimination but refuses to take any corrective action to stop the discrimination or hold discriminators accountable. For example, in or around January 2022, Black Crew Leaders reported Towns' non-Black supervisor to Peoples Gas for his racist behavior. Rather than meaningfully investigate and act on the complaints, Peoples Gas and the supervisor began a campaign of unlawful retaliation designed to terminate Towns' employment. They subjected Towns to heightened and unwarranted scrutiny.

51.     Faced with an increasingly hostile and unlawful workplace, Towns filed a complaint about his supervisor's discrimination and retaliation with Peoples Gas and the WEC Energy ethics hotline. Peoples Gas told Towns he could bring others who suffered discrimination and retaliation at the hands of the supervisor to a meeting about his complaint. Towns talked to his co-workers, who shared with him their experiences of discrimination. However, at the meeting and contrary to its representations to Towns, Peoples Gas refused to allow most witnesses and victims of discrimination to participate, and it refused to conduct a proper

investigation. Peoples Gas took no action against the supervisor or to stop the discrimination against Towns and others.

52.     Peoples Gas continued to escalate its campaign of discrimination and retaliation against Towns. In or around May 2022, one Black and one white individual working on Towns' crew inadvertently damaged an underground service line, a common occurrence in the industry. In a blatant act of race discrimination, Peoples Gas terminated Towns and the Black crew member, but it did not discipline the white crew member.

53.     Peoples Gas terminated Towns in July 2022 because of his race and in retaliation for opposing the company's rampant discrimination. Peoples Gas provided glaringly pretextual reasons, including claiming he was not wearing proper personal protective equipment while entering the excavation during the May 2022 incident. However, Towns never entered the excavation. Peoples Gas even openly acknowledged its retaliatory motive, stating that one reason for his firing was because he sought information from coworkers about their discriminatory experiences, which is plainly protected activity.

54.     As a result of Peoples Gas's unlawful conduct, discriminatory policies and practices, and retaliation, Towns has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Garland Eleby

55.     Plaintiff Garland Eleby started working at Peoples Gas in Chicago in 2018. Eleby was subjected to and harmed by Peoples Gas's discriminatory policies and practices described above, including discriminatory denial of overtime, among other unlawful conduct.

56.     Eleby is a veteran of the U.S. Marine Corps; he joined Peoples Gas after graduating from a training program that places veterans in careers as utility workers. Consistent

15

with its policy of segregating its workforce by race, Peoples Gas assigned the one white graduate in Eleby's class to the North Shop but assigned Eleby and four other African American graduates to the South Shop.

57.     Throughout his career at Peoples Gas, Eleby has been subjected to a hostile work environment in which racist comments are commonplace, and Peoples Gas supervisors do little to discourage such comments or punish those who make them. For example, a white pipefitter once referred to a customer as a "fucking n*****" while Eleby was standing nearby. No one was surprised or took any action against the employee, and Eleby has frequently heard similar comments. One white employee told Eleby "I like you, you're one of the good ones," implying most African Americans are not.

58.     Eleby has also fallen victim to Peoples Gas's discriminatory steering and safety practices. In 2019, in the late evening hours, Plaintiffs Eleby, Trass, and Nunn were dispatched to respond to a gas leak. Peoples Gas did not assign a security detail to accompany them to this work assignment. Around 3:30 am, three armed men approached the crew and attempted to rob them. A man pointed a gun at Eleby through the window of the truck and another pushed Trass to the ground and held him at gunpoint. Luckily, the gun did not fire, and the robbers eventually left the scene. However, Peoples Gas did not send anyone to relieve Eleby, Trass, and Nunn after the robbery; Peoples Gas forced them to remain at the site where they were robbed at gunpoint for another five hours after the assault, 17 hours after their shift began.

59.     In a similar incident, Eleby was sent to cut off a customer's gas. The customer was armed and swore at and threatened Eleby. When he informed his supervisor of this dangerous incident, his supervisor laughed in his face. This supervisor's reaction reflects Peoples

Gas's cavalier attitude toward the safety of its African American employees—that their assaults are to be expected and accepted.

60.     In January 2023, Eleby was again assaulted in a violent fashion. After completing work at a residence in the Southside of Chicago, Eleby returned to his truck parked nearby. Again, Peoples Gas had provided no security. Several men with a gun attacked his coworker near the truck. Eleby attempted to disarm the men and called 911. The armed assailants escaped, and Eleby was able to return to the South Shop. Peoples Gas was unconcerned and required him to return to South Shop the following morning.

61.     As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Eleby has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Letitia Jackson

62.     Plaintiff Letitia Jackson worked for Peoples Gas from 2019 until her constructive discharge in 2022. She was last a Utility Worker in Peoples Gas's South Shop. Jackson was subjected to and harmed by Peoples Gas's discriminatory policies and practices described above, including the discriminatory denial of overtime, among other unlawful conduct.

63.     Jackson joined Peoples Gas in July 2019 through the Utility Workers Military Assistance Program. During her military service, Jackson was injured and developed an anxiety disorder, of which she informed Peoples Gas at the time of her application.

64.     Consistent with Defendants pattern and practice of discrimination, while at Peoples Gas, Jackson was subjected to a racially hostile work environment, including racist comments and attacks on her job, reputation, and performance. In one such incident, a crew leader falsely stated that Jackson would not complete all tasks at a job site, including entering a

below-ground worksite, because "Black girls don't want to get their hair wet and dirty," or words to that effect. The crew leader forbade Jackson from entering the below-ground site, even though she wanted to, and continued to demean her and deny her opportunities to learn and advance. When Jackson attempted to work with a white crew leader and trainer to develop additional skills and advance her career, Peoples Gas denied her the opportunity to work with the white crew leader. Her coworkers and supervisors openly stated that the white crew leader only wanted to work with her "because he likes Black women," or words to that effect. Jackson was often targeted because of her race, including when a supervisor yelled at her to "get your Black ass in the hole," or words to that effect.

65.      Peoples Gas also forced Jackson to endure a sexually hostile work environment throughout her tenure.[1] For instance, a colleague told her, "I can see what you've got. I can help pay your baby's Christmas bills. Do you need a sugar daddy?," or words to that effect. On another occasion, a colleague referenced a company vehicle and told Jackson, "you can go sleep in the van with me," or words to that effect. Another offered to take her on a shopping spree in exchange for sex. Coworkers frequently and publicly speculated about Jackson's sex life.

66.      One male coworker made numerous sexually harassing statements that put Jackson in fear of sexual assault. In one instance, while alone in a company vehicle with Jackson, this male coworker touched a button on Jackson's coveralls in a sexually suggestive manner, over her objection. He told her that he could see through her clothes, and threatened that she could not go to Human Resources because no one would believe her. Peoples Gas knew of

---

[1] Jackson's Equal Employment Opportunity Commission ("EEOC") charge is currently pending, and she intends to amend this complaint to include her Title VII claim after exhausting the administrative process.

and refused to stop this predatory behavior. The same employee had previously sexually targeted another woman, who complained to the company to no avail.

67.     Consistent with Peoples Gas's practices, in addition to being subjected to a racially and sexually hostile work environment, Jackson was also harmed by Peoples Gas's discriminatory steering and safety practices. In approximately the summer of 2020, on a work call, a landlord led Jackson into a basement where, to her surprise, several other men were waiting. She called and requested security and emergency assistance from Peoples Gas, but she was ignored and forced to call 911 from her personal phone. When she returned to the office and filed a report with the head of security, consistent with Peoples Gas's racially discriminatory culture, the head of security was dismissive, and Jackson was told that she had to return to the field the next day.

68.     Jackson was assaulted again while on a service call. Jackson was once again assigned to work alone and had to go into a basement with a male customer to turn on the customer's gas. The customer asked for Jackson's phone number, and when she refused, he cursed at her and physically assaulted her. Jackson called for security assistance, which was characteristically slow to arrive. When a supervisor finally arrived on the scene, he was dismissive and informed her that the "job still has to get done," or words to that effect. Jackson returned to the South Shop and filed internal and police reports of the incident. Peoples Gas discouraged her from taking legal action against the customer. Although the customer escaped punishment for assaulting and battering Jackson, Peoples Gas chastised Jackson for including the curse words he spoke to her in her report.

69.     In yet another incident, a customer became hostile toward Jackson and tried to block her exit from the building, then followed her. Jackson had to endure 20 minutes of being

pursued by the angry customer before the police and Peoples Gas security finally arrived. The Peoples Gas supervisor showed no concern for Jackson's safety or health and told her to go back into the apartment to turn on the customer's gas.

70.     As a result of these attacks, Jackson had debilitating migraines and panic attacks multiple times a week, which substantially limited her ability to engage in major life activities. Peoples Gas then made her appear before a disciplinary panel several times for taking too much leave in response to the several assaults she suffered on the job. After one such panel hearing, Jackson suffered a panic attack and went to a locker room to have an urgent telemedicine appointment with her doctor. Her Peoples Gas supervisor came into the bathroom and, in the middle of her panic attack and her telemedicine appointment, told her to get into the truck and return to the field.

71.     Jackson ultimately had a short-term disability leave approved, and took FMLA leave. Peoples Gas repeatedly interfered with her leave by failing to process the appropriate paperwork, demanding unnecessary records, and failing to send her appropriate notices. Jackson's supervisor called during her leave pressuring her to return. Terrified, Jackson retained counsel to help and advised Peoples Gas that she had retained counsel to secure a safe and discrimination-free working environment. In retaliation, Peoples Gas cut Jackson's leave short.

72.     Peoples Gas also violated Jackson's rights under the Americans with Disabilities Act ("ADA").[2] After the assaults, and periodically throughout her employment, Jackson repeatedly asked Peoples Gas to reasonably accommodate her anxiety disorder, which had been exacerbated and become debilitating due to the conduct of Peoples Gas, by moving her to a position that she previously held because it would enable her to consistently work with a crew of

---

[2] Jackson's EEOC charge is currently pending, and she intends to amend this complaint to include her ADA claim after exhausting the administrative process.

other employees. Peoples Gas denied her reasonable requests and repeatedly refused to engage in the interactive process, offering shifting, pretextual rationales for its denials. For example, Peoples Gas first claimed that Jackson could not work in this role without a Commercial Driver's License, but when Jackson obtained her CDL, Peoples Gas did not permit her to work in this role.

73.     While Jackson was on leave, multiple Peoples Gas managers pressured her to return. Jackson once again requested an accommodation to work alongside a crew, and Peoples Gas refused to entertain the idea and did nothing to engage with Jackson in determining alternative accommodations that might permit Jackson to continue working. Instead, Peoples Gas insisted that Jackson return without accommodations or be fired. As a result of the treatment described above, including Peoples Gas's rampant racial and sexual harassment, refusal to act in the face of repeated threats to her physical safety, and denial of reasonable accommodations, Jackson had no choice but to leave Peoples Gas to preserve her physical and mental health.

74.     As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Jackson has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Karen Lanford

75.     Plaintiff Karen Lanford has worked for Peoples Gas for approximately 15 years and is currently an Operations Apprentice in Peoples Gas's South Shop. Lanford was subjected to and harmed by Peoples Gas's discriminatory policies and practices described above, including the discriminatory denial of overtime, among other unlawful conduct.

76.     Consistent with Peoples Gas's discriminatory employment practices, Lanford has on multiple occasions been passed over for promotion or reassignment in favor of non-Black employees.

77.     Lanford was subjected to the racially hostile work environment at South Shop, where racist comments and conduct were commonplace. Despite her long tenure and knowledge, Peoples Gas also treated Lanford like the Black "help," demanding she perform janitorial duties outside of her job description such as emptying the trash or cleaning uniforms.

78.     Lanford, too, fell victim to Peoples Gas's discriminatory steering and safety practices. In 2019, in the late evening hours, Lanford and Plaintiff Scoggins were dispatched to respond to a non-emergency service request at an apartment complex. Lanford and Scoggins were robbed at gunpoint as they were about to leave the job site. While Lanford was in the vehicle, a gunman opened her door and put a gun to her head.

79.     Lanford was again attacked on the job in or around March 2021. Peoples Gas dispatched Lanford again to a dangerous neighborhood, where a man walked up to the window of Lanford's truck and began to brandish a brick with apparent designs to smash Lanford's window. Although the assailant ran off, the near-miss incident caused Lanford emotional harm and reaffirmed that her working conditions remained unsafe.

80.     As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Lanford has suffered substantial harm, including lost wages and other benefits and emotional distress.

Plaintiff Tamia Nunn

81.     Plaintiff Tamia Nunn worked at Peoples Gas from 2018 until Peoples Gas unlawfully terminated her in 2022. Nunn was subjected to and harmed by Peoples Gas's

discriminatory policies and practices described above, including the discriminatory denial of overtime, among other unlawful conduct.

82.     Nunn was subjected to the racially hostile work environment at South Shop, where racist comments and conduct were commonplace. Nunn has fallen victim to Peoples Gas's discriminatory steering and safety practices. Nunn is a veteran of the Air Force and joined Peoples Gas after completing a training program. Peoples Gas assigned Nunn to the South Shop, along with over half of the African Americans in her cohort at the training program. As a result of Peoples Gas's racial steering and inadequate security, and as described above, in 2019, Plaintiffs Eleby, Trass, and Nunn were robbed by three armed men while working in the middle of the night. This assault caused an anxiety disorder, necessitating medical leave.

83.     Consistent with its discriminatory practices, Peoples Gas frequently subjected Nunn to arbitrary and unwarranted discipline, including but not limited to frequently calling her before disciplinary panels for approved medical leaves.

84.     Further, in or around February and March of 2021, Nunn took maternity leave under the FMLA. Upon her return and in retaliation for her leave, among other things Peoples Gas denied her the opportunity to take an exam she needed to fully return to the job.

85.     Peoples Gas also retaliated against Nunn for her protected activity of retaining counsel and demanding a safe workplace free of racial discrimination. In December 2021, Nunn informed Peoples Gas that she had retained counsel. Peoples Gas took no action to investigate, to end the discrimination, or to make her workplace safe. Instead, the discrimination continued and Peoples Gas launched its campaign of retaliation designed to terminate her employment.

86.     Peoples Gas began deducting time from Nunn's paycheck for nursing breaks that Nunn was not taking. Though fully aware that Nunn was expressing milk during her lunch

breaks, Peoples Gas nonetheless illegally deducted pay for nursing breaks it knew she did not take. Peoples Gas permitted non-Black employees who did not engage in protected activity to express milk during lunch breaks without deduction in pay.

87.     Peoples Gas also denied Nunn reasonable accommodations, as it did to other African American employees.[3] For example, in or around June 2020, Nunn, who was pregnant at the time, orally reported that the seat in her truck was causing her back pain and requested to drive a different truck. Although Peoples Gas provided accommodations such as light duty for white employees with similar health concerns, Peoples Gas refused to provide a different truck to Nunn.

88.     In another violation of the ADA, Peoples Gas also refused to engage in the interactive process for reasonable accommodations and interfered with Nunn's leave that resulted from being a victim of armed robbery. This anxiety disorder substantially limited her ability to engage in major life activities, though Nunn was nevertheless qualified to perform the essential function of her job. Shortly after learning that Nunn had retained counsel, Peoples Gas abruptly cut short Nunn's approved medical leave. Peoples Gas also refused to engage in the interactive process or suggest other reasonable accommodations.

89.     When Nunn asked for further information, an HR representative warned Nunn not to request accommodations because she would be fired, or words to that effect. Nunn was forced to return to work without adequate assurance of her safety and without accommodations for her work-related health concerns. Eventually, Peoples Gas unlawfully terminated Nunn because of her race and in retaliation for taking medical leave and complaining about racial discrimination.

---

[3] Nunn's EEOC charge is currently pending, and she intends to amend this complaint to include her ADA claim after exhausting the administrative process.

90. As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Nunn has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Reginald Scoggins

91. Plaintiff Reginald Scoggins has worked at Peoples Gas for over 14 years and is currently a Journeyman in Peoples Gas's South Shop. Scoggins was subjected to and harmed by Peoples Gas's discriminatory policies and practices described above, including discriminatory denial of overtime, among other unlawful conduct.

92. Like other Black workers, Scoggins fell victim to Peoples Gas's discriminatory steering and safety practices. As described above, in 2019, Peoples Gas dispatched Scoggins and Lanford, without security, to respond to a non-emergency in the late evening hours; they were assaulted and robbed at gunpoint. Scoggins suffered severe emotional distress and was required to take an extended leave of absence to recover from the assault and robbery.

93. Scoggins was also subjected to the racially hostile work environment at South Shop, where racist comments and conduct were commonplace. As just one example, Scoggins was forced to endure racist comments his non-Black coworkers made about Black customers, such as how surprised these coworkers were to see a Black father present in a home or to see Black customers with nice homes.

94. Peoples Gas then retaliated against Scoggins for reporting unsafe working conditions and racial discrimination. Fearing for his life and facing ongoing racial discrimination, Scoggins was forced to retain counsel who informed Peoples Gas of his claims of discrimination in writing. After that, Scoggins was subjected to increased scrutiny and unequal and unwarranted discipline.

95.     Scoggins has also suffered from Peoples Gas's practice of denying reasonable accommodations to African American employees. In 2022, Scoggins took medical leave for an injured Achilles tendon. Instead of engaging in an interactive process with Scoggins and permitting him to return on light duty, Peoples Gas required him to return at 100% capacity or not at all. Scoggins was forced to forgo wages by taking a longer leave. Peoples Gas permits non-Black employees to return to work on light duty.

96.     As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Scoggins has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Christopher Trass

97.     Plaintiff Christopher Trass has worked for Peoples Gas for approximately 16 years and is currently a Crew Leader in Peoples Gas's South Shop. Trass was subjected to and harmed by Peoples Gas's discriminatory policies and practices described above, including discriminatory denial of overtime, among other unlawful conduct.

98.     Furthermore, Trass has fallen victim to Peoples Gas's discriminatory steering and safety practices. As described above, in 2019, Plaintiffs Eleby, Trass, and Nunn were robbed by three armed men while working in the middle of the night. The armed men pushed Trass to the ground at gunpoint, demanded money, and took Trass's work phone. Trass heard one of the gunmen pull the trigger on the gun, which fortunately did not fire. Despite the severe trauma and terror they endured, Peoples Gas refused to send anyone to relieve Eleby, Trass, and Nunn after the robbery. Peoples Gas forced them to remain at the site where they were robbed at gunpoint for another five hours after the assault, 17 hours after their shift began. Trass suffered severe

emotional distress and was forced to take an extended leave of absence to recover from the assault and robbery.

99.     Trass was also subjected to the racially hostile work environment at South Shop, where racist comments and conduct were commonplace. As just one example, Trass was forced to endure racist comments his non-Black coworkers made about Black communities that these coworkers left in disarray and strewn with debris.

100.     As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Trass has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Darryl Woods

101.     Plaintiff Darryl Woods has worked for Peoples Gas for approximately 17 years and is currently a Utility Worker in Peoples Gas's South Shop. Woods was subjected to and harmed by Peoples Gas's discriminatory policies and practices described above, including discriminatory denial of overtime, among other unlawful conduct.

102.     Woods has fallen victim to Peoples Gas's discriminatory steering and safety practices. In approximately November 2021, Peoples Gas had assigned Woods to work by himself when a woman hit the Peoples Gas van he was driving with her vehicle. The woman pulled a gun out of her car and approached Woods's van, pointed her gun at him, and said, "I should shoot you," or words to that effect. A man, who appeared to also be armed, quickly arrived on the scene and joined in threatening Woods. But Peoples Gas and security were unreasonably slow in responding to Woods's report that he was in imminent danger, forcing Woods to endure being threatened at gunpoint for approximately 30 to 40 minutes before security arrived. Even then, the security personnel was uninterested in Woods's safety.

27

103.    Peoples Gas required Woods to wait for police to arrive on the scene. After approximately two hours of waiting in the presence of an armed woman who threatened to kill him, Woods decided he could wait no longer and drove to the police station to file a report.

104.    The next day, Peoples Gas demanded that Woods come to work and demonstrated no concern for Woods's wellbeing after he was assaulted at gunpoint on the job. Rather, Peoples Gas held a disciplinary panel hearing about the damage to the Peoples Gas van. It took no corrective action related to the armed assault against Woods.

105.    Woods has also suffered from Peoples Gas's discriminatory treatment of African Americans in disability accommodations. In 2021, Woods underwent hip surgery that interfered with and limited his ability to walk. To avoid interrupting his recovery from surgery, he requested to return to work at Peoples Gas on light duty. Yet Peoples Gas denied Woods a reasonable light-duty accommodation without any inquiry into the nature of his injury or recovery and without engaging in the interactive process. Woods provided all necessary documentation of his injury and proposed several types of light-duty work that he could perform. Peoples Gas flatly rejected his proposals without engaging in the interactive process and instead, consistent with its racially hostile beliefs about African American employees, ordered Woods to return to work at 100% of his duties or lose his job. Rather than be terminated, Woods returned to his full duties on or about May 2021, notwithstanding his recent surgery. His early return interrupted his recovery, and his hip has not fully recovered to this day.

106.    Peoples Gas has similarly required other African American employees with disabilities or other work restrictions to return to work at 100% of their duties. But Peoples Gas does not impose the same unlawful requirements on its white employees. For example, a white

woman underwent hamstring surgery and was permitted to return to light-duty work. A white

man had hip replacement surgery and was allowed to return to light-duty work as well.

107.    Consistent with its discriminatory employment practices, Peoples Gas denied

Woods advancement and promotional opportunities. As described above, Peoples Gas

encourages non-Black employees to pursue advancement opportunities and supports them in

doing so while denying the same resources to African Americans.  While Peoples Gas allowed

non-Black employees to take exams multiple times without penalty, Woods was denied an

opportunity to retake an exam and was instead demoted, causing a loss in his wages.

108.    After Woods was forced to retain counsel, Peoples Gas began targeting him by

failing to accommodate a medical need and a supervisor threatened to demote him.

109.    As a result of Peoples Gas's unlawful conduct and discriminatory policies and

practices, Woods has suffered substantial harm, including lost wages and other benefits and

emotional distress.

Plaintiff Ericka Garmon

110.    Plaintiff Ericka Garmon began at Peoples Gas as a Customer Service

Representative approximately 24 years ago, and she has worked in a variety of roles over the

years. In 2014, she began in Peoples Gas's South Shop as an Operations Specialist II and is

primarily responsible for payroll. Garmon works alongside Plaintiff Simmons and worked with

Plaintiff Daniel before Peoples Gas constructively discharged Daniel. Garmon was subjected to

and harmed by Peoples Gas's discriminatory practices described above, including the

discriminatory denial of overtime.

111.    Peoples Gas subjected Garmon to unwarranted, heightened scrutiny and

micromanagement because of Garmon's race. Peoples Gas and Garmon's immediate supervisor

29

also subjected Garmon and other African Americans on her team (including Simmons and Daniel) to different terms and conditions of employment than non-Black employees and created a racially hostile work environment, including but not limited to ignoring and marginalizing Garmon and her African American peers and denying them advancement opportunities. Her supervisor's behavior is supported by higher-level managers, and Garmon's coworkers confirmed that she was targeted for unwarranted scrutiny, heightened supervision, and shifting, contradictory expectations, among other things.

112.    Garmon made numerous written and verbal complaints of race discrimination to Peoples Gas Human Resources ("HR"), managers, and the WEC Energy ethics group. Instead of meaningfully investigating and addressing the discrimination, Peoples Gas retaliated against Garmon. Among other things, Peoples Gas gave Garmon a significantly lower annual merit increase for 2022 than was warranted by her performance.

113.    In or around January 2022, Garmon submitted a written complaint about her discriminatory compensation as well as Peoples Gas's and her supervisor's ongoing racial discrimination.

114.    In further retaliation for complaining of racial discrimination and because of her race, Peoples Gas is attempting to force Garmon to quit or is setting her up for termination, including by placing Garmon on an unjustified performance improvement plan ("PIP"). Despite Garmon meeting the objective criteria in her PIP within the required timeframe, Peoples Gas extended it.

115.    Consistent with its discriminatory practices, Peoples Gas has denied Garmon advancement and higher paying jobs because of her race and in retaliation for her protected activity. For example, Garmon has applied to several positions within Peoples Gas, and despite

her over two decades of experience and strong performance, Peoples Gas has refused to hire her for any of the positions to which she has applied. When Garmon complained to HR that she felt that Peoples Gas had blacklisted her from any advancement or other job opportunities within the company, HR admitted that senior managers were aware of her complaints of race discrimination and tacitly acknowledged the retaliation by denying her jobs and other opportunities.

116.    Garmon has used FMLA leave as needed during her employment. As a result of Garmon's exercise of her rights under the FMLA, Peoples Gas subjected her to retaliation, including but not limited to heightened scrutiny, unwarranted discipline, and micromanagement. When a former coworker took FMLA leave, Garmon's supervisors spoke poorly of the individual for taking leave. To discourage her from taking FMLA leave, Peoples Gas has imposed additional requirements on Garmon's use of FMLA leave, including requiring that she fill out paperwork that it does not require of other employees.

117.    As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Garmon has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Shawnda Simmons

118.    Plaintiff Shawnda Simmons has worked for Peoples Gas for over 16 years and is currently an Operations Specialist II in the South Shop. Simmons was subjected to Peoples Gas's discriminatory policies and practices described above, including the discriminatory denial of overtime. And, like Garmon, Peoples Gas subjected Simmons to unwarranted, heightened scrutiny, and micromanagement because of her race.

119.    After receiving complaints of discrimination from Simmons and her coworkers, Peoples Gas continued to harass, discriminate against, and retaliate against Simmons and her

coworkers Garmon and Daniel. For example, in August 2022, Peoples Gas demanded these three Black women audit the cleanliness of the women's bathroom—demeaning janitorial work outside of their job descriptions. In further acts of discrimination and retaliation, Peoples Gas subjected Simmons to differential discipline, including by placing her on an unjustified PIP for conduct for which a Hispanic coworker was not placed on a PIP.

120.    Peoples Gas's discrimination and retaliation continues to escalate. For example, in or around April 2023, Simmons's manager gave to her (and her coworkers Garmon and Daniel) a handout outlining expectations for the work environment. Instead of treating Simmons and her coworkers as professionals, the handout was rife with racial stereotypes about Black women, asking them to, among other things, refrain from "eye rolling," "sigh[ing]," and "engaging in gossip."

121.    Simmons also witnessed Peoples Gas's discriminatory treatment of its Black field employees, particularly with respect to training and promotional opportunities and shift assignments. As just one example, Simmons fielded complaints from Black employees denied notice and study time for exams unlike non-Black employees given sufficient notice and time to study.

122.    As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Simmons has suffered substantial harm, including lost wages and other benefits, and emotional distress.

Plaintiff Laticia Daniel

123.    Plaintiff Laticia Daniel worked at Peoples Gas from 2006 until she was constructively discharged in 2023. She worked as an Operations Specialist II alongside Plaintiffs Garmon and Simmons, and was subjected to Peoples Gas's discriminatory policies and practices

described above, including but not limited to unwarranted, heightened scrutiny and micromanagement because of Daniel's race and the discriminatory denial of overtime.

124.    In 2022, Daniel complained about differential discipline that Peoples Gas imposed upon her and her African American teammates. In response, Peoples Gas retaliated. As described above, Daniel and her teammates were asked to do janitorial work not in their job description. In a further act of retaliation and discrimination, Peoples Gas placed on Daniel an unjustified PIP for conduct for which a Hispanic coworker was not placed on a PIP.

125.    In or around February 2023, an HR representative and an attorney made a presentation to Daniel and her coworkers, ostensibly to inform them about anti-discrimination law but plainly designed to mislead and threaten them. The attorney warned them that discrimination is "hard to prove," or words to that effect, a blatant attempt to chill any continued protected activity.

126.    In June of 2023, to preserve her career and mental health, Daniel had no choice but to leave Peoples Gas and the discriminatory environment she endured daily.

127.    As a result of Peoples Gas's unlawful conduct and discriminatory policies and practices, Daniel has suffered substantial harm, including lost wages and other benefits, and emotional distress.

## CLASS ALLEGATIONS

128.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of African Americans in the South and Central Shops who worked for Defendants at levels below Supervisor, including Operator Apprentices, Utility Workers, Journeymen, Crew Leaders, and Operations Specialists. Plaintiffs seek certification of a liability and injunctive and declaratory relief class under Rule 23(b)(2) and

23(c)(4), and/or certification of a class under Rule 23(b)(3). All requirements of class certification are met by the proposed class:

129.     The class of African American employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

130.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

131.     The claims alleged by Plaintiffs are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

132.     Plaintiffs will fairly and adequately represent and protect the interests of the class, and they have retained competent and experienced counsel to represent the class. Fed. R. Civ. P. 23(a)(4).

133.     The proposed class meets the requirements for certification under Rule 23(b)(2), as Peoples Gas has acted and refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

134.     The proposed class meets the requirements of Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

135.     The issues of determining liability and equitable and injunctive relief, among other issues, are appropriate for certification under Rule 23(c)(4), as are other common issues.

**COUNT I**
**RACE DISCRIMINATION IN VIOLATION OF**
**42 U.S.C. § 1981**
**(Class and All Individual Plaintiffs)**

136.    Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

137.    42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

138.    Defendants maintain discriminatory employment policies and practices and engage in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

139.    Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

**COUNT II**
**RACE DISCRIMINATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-1, *et seq.***
**(Class and Plaintiff Woods[4])**

140.    Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

_____

[4] Other Plaintiffs have filed representative charges of discrimination with the EEOC, and they intend to amend this complaint to include their individual and class Title VII claims after exhausting the administrative process.

141.    Woods filed a representative charge of racial discrimination with the Equal

Employment Opportunity Commission ("EEOC") and exhausted his administrative remedies and

received a Notice of Right to Sue.

142.    Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.* and amendments

thereto ("Title VII") make it an unlawful employment practice for an employer to discharge or

otherwise to discriminate against any individual with respect to his or her compensation, terms or

conditions, or privileges of employment because of such individual's race, color, or national

origin; or to limit, segregate, or classify employees or applicants for employment in any way

which would deprive or tend to deprive any individual of employment opportunities or otherwise

adversely affect his status as an employee, because of such individual's race, color, or national

origin.

143.    Defendants violated Title VII by subjecting Plaintiffs, and other similarly situated

African American employees, to differential treatment and by adopting policies and practices

that had a disparate impact on African Americans.

144.    Plaintiffs and all those similarly situated were subjected to and harmed by

Defendants' systemic and individual discrimination.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**42 U.S.C. § 1981**
**(Plaintiffs Towns, Jackson, Nunn, Scoggins, Woods, Garmon, Simmons, and Daniel)**

145.    Plaintiffs Towns, Jackson, Nunn, Scoggins, Woods, Garmon, Simmons, and

Daniel reallege the above paragraphs and incorporate them by reference as though fully stated

herein as part of Count III of this Complaint.

146.    Plaintiffs Towns, Jackson, Nunn, Scoggins, Wood, Garmon, Simmons, and Daniel engaged in protected activity and suffered retaliation by Defendants in violation of 42 U.S.C. § 1981.

147.    Plaintiffs Towns, Jackson, Nunn, Scoggins, Woods, Garmon, Simmons, and Daniel suffered harm as a result of Defendants' unlawful retaliation.

**COUNT IV**
**DISABILITY DISCRIMINATION IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT:**
**42 U.S.C. § 12101, *et seq.***
**(Plaintiff Woods)[5]**

148.    Plaintiff Woods realleges the above paragraphs and incorporate them by reference as though fully stated herein as part of Count IV of this Complaint.

149.    An employer discriminates with respect to a disability by failing to make a reasonable accommodation, and an employer has an affirmative obligation to engage with an employee in an interactive process to determine an appropriate accommodation. 42 U.S.C. § 12112; 29 C.F.R. § 1630.2.

150.    Woods was a qualified person with a disability under the ADA, and able to perform the essential functions of his job. Defendants were aware of his disabilities.

151.    Defendants refused to reasonably accommodate Woods, and refused to engage in the interactive process to determine alternative accommodations that might permit him to continue working.

152.    As a result of Peoples Gas's actions, Woods suffered harm.

---

[5] As explained above, Plaintiffs Nunn and Jackson have currently pending EEOC charges, and they intend to amend this complaint to include their ADA claims after exhausting the administrative process.

## COUNT V
### RETALIATION IN VIOLATION OF THE FMLA
### 29 U.S.C. § 2615, *et seq.*
### (Plaintiffs Jackson, Nunn, and Garmon)

153.    Plaintiffs Jackson, Nunn, and Garmon reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count V of this Complaint.

154.    The FMLA prohibits employers from retaliating against individuals who invoke the FMLA rights they are entitled to. 29 U.S.C. § 2615(a)(2).

155.    Jackson, Nunn, and Garmon engaged in protected activity under the FMLA, including by taking FMLA leave.

156.    By the conduct alleged herein, Defendants retaliated against Jackson, Nunn, and Garmon for exercising their FMLA rights by subjecting them to a series of actions that would discourage an individual from engaging in protected FMLA activity.

157.    Plaintiffs Jackson, Nunn, and Garmon suffered damages as a result of Defendants' unlawful conduct.

## COUNT VI
### INTERFERENCE WITH FMLA RIGHTS
### 29 U.S.C. § 2615, *et seq.*
### (Plaintiffs Jackson and Garmon)

158.    Plaintiffs Jackson and Garmon reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count VI of this Complaint.

159.    It is unlawful for any employer to interfere with, restrain, discourage or deny the exercise of attempt to exercise and right provided by the FMLA. 29 U.S.C. § 2615(a)(1).

160.    Defendants interfered with, restrained, and discouraged Jackson's use of FMLA leave, including but not limited to by contacting her while on FMLA leave and pressuring her to return before her leave was complete.

161.     Defendants interfered with, restrained, and discouraged Garmon's use of FMLA, including but not limited to by imposing additional requirements upon Garmon to be able to take leave that it did not impose on other employees and making comments regarding the use of FMLA leave.

162.     As a result of Peoples Gas's conduct, Jackson and Garmon suffered harm.

**COUNT VII**
**DISCRIMINATION IN VIOLATION OF**
**ILLINOIS HUMAN RIGHTS ACT**
**775 ILCS 5 *et. seq.***
**(Class and Plaintiff Woods)**

163.     Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count VII of this Complaint.

164.     Section 5/2-102(A) of the Illinois Human Rights Act makes it unlawful for any employer to discriminate on the basis of race, gender, or disability with respect to recruitment, hiring promotion, renewal of employment, discharge, discipline, tenure or terms, privileges, or conditions of any employee.

165.     By their conduct alleged herein, Defendants violated the Illinois Human Rights Act by subjecting Plaintiffs, and other similarly situated African American employees, to differential treatment and by adopting policies and practices that had a disparate impact on African Americans.

166.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination in violation of the Illinois Human Rights Act.

167. By reason of Defendants' discrimination, Plaintiffs and all those similarly situated are entitled to all legal and equitable remedies available for violations of the Act.

## COUNT VIII
### ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### 820 Ill. Comp. Stat. Ann. 115/1, *et seq.*
### (Plaintiff Nunn)

168. Plaintiff Nunn realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count VIII of this Complaint.

169. At all relevant times, Nunn was an employee of Defendants and had an agreement with Defendants that she would be compensated for all time worked.

170. Defendants failed to compensate Nunn for all wages earned by deducting time for nursing breaks that Nunn did not take.

171. As a result of failing to pay all wages owed, Defendants violated the Illinois Wage Payment and Collection Act.

172. As a result of Defendants' actions, Nunn suffered harm.

## COUNT IX
### ILLINOIS GENDER VIOLENCE ACT
### 740 ILCS 82/1 *et seq.*
### (Plaintiff Jackson)

173. Plaintiff Jackson realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IX of this Complaint.

174. The Illinois Gender Violence Act ("IGVA") provides that "[a]ny person who has been subjected to gender-related violence as defined in Section 5 may bring a civil action for damages, injunctive relief, or other appropriate relief against a person or persons perpetrating that gender-related violence." 740 ILCS § 82/10.

175. Gender-related violence is defined to include an act or threat of a "physical intrusion or physical invasion of a sexual nature under coercive conditions" or of a "physical

aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's sex." 740 Ill. Comp. Stat. Ann. 82/5.

176. "Perpetrating" an act of gender-related violence means "either personally committing the gender-related violence or personally encouraging or assisting the act or acts of gender-related violence." 740 Ill. Comp. Stat. Ann. § 82/10.

177. Defendants are subject to the IGVA under Illinois's liberal construction of the term "'persons' as well because all words referring to or importing persons to include bodies politic and corporate as well as individuals." 5 Ill. Comp. Stat. Ann. § 70-/1.05.

178. Defendants knew or should have known that the employee who touched Jackson in a sexual manner had a propensity for sexual harassment, unwanted touching, and other inappropriate conduct based on previous complaints. Defendants personally assisted this employee in committing gender-related violence and/or sexual assault; Defendants continued to employ this employee and required Jackson to work with him despite its knowledge of previous incidents.

179. As a result of experiencing gender-related violence, Jackson is entitled to damages and other appropriate relief, including emotional distress, punitive damages, and attorney's fees and costs. 740 Ill. Comp. Stat. Ann. § 82/15.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiffs Towns, Eleby, Jackson, Lanford, Nunn, Scoggins, Trass, and Woods)

180. Plaintiffs Towns, Eleby, Jackson, Lanford, Nunn, Scoggins, Trass, and Woods reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count X of this Complaint.

181. Defendants engaged in extreme and outrageous conduct against Plaintiffs Towns, Eleby, Jackson, Lanford, Nunn, Scoggins, Trass, and Woods as outlined in the paragraphs above.

182. Defendants stood in a position of power and authority relative to Plaintiffs Towns, Eleby, Jackson, Lanford, Nunn, Scoggins, Trass, and Woods.

183. Defendants intended their conduct to cause severe emotional distress or knew that there was a high probability that their conduct would cause severe emotional distress.

184. Plaintiffs Towns, Eleby, Jackson, Lanford, Nunn, Scoggins, Trass, and Woods suffered severe emotional distress as a result of Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the class they seek to represent and against Defendants as follows:

a. Certify this case as a class action;

b. Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c. Declare that Defendants' acts, conduct, policies, and practices are unlawful and violate the laws;

d. Declare that Defendants engaged in a pattern and practice of racial discrimination against African Americans;

e. Award Plaintiffs and all others similarly situated compensatory and punitive damages;

i. Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

j. Award Plaintiff and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end Defendants' discrimination and fairly compensate Plaintiffs and all others similarly situated;

k.     Award Plaintiffs and all others similarly situated such other relief as this Court

deems just and proper.

## **<u>DEMAND FOR A JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure and Civil Local Rule 3-6.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By: */s/ Suzanne E. Bish*_____
　　Suzanne E. Bish
　　**STOWELL & FRIEDMAN LTD.**
　　303 W. Madison St., Suite 2600
　　Chicago, Illinois 60606
　　Phone: (312) 431-0888
　　sbish@sfltd.com

43